STANDARD MUTUAL INSURANCE COMPANY, Plaintiff-Appellee, v. ROY W. PETREIKIS *et al.*, Defendants-Appellants.

Fourth District No. 4—88—0683

Opinion filed May 17, 1989.

Cifelli, Baczynski & Scrementi, Ltd., of Chicago Heights (Anthony C. Scrementi, Robert F. Chudada, and Luciano Panici, of counsel), for appellants.

Kepner & Kepner, of Springfield (Maurice W. Kepner, of counsel), for appellee.

JUSTICE LUND delivered the opinion of the court:

After an evidentiary hearing, a declaratory judgment order was entered by the circuit court of Sangamon County, holding defendants Roy W. Petreikis and Mary Frances Petreikis were not entitled to the benefits or payments under the uninsured motorist coverage of Roy Petreikis' automobile insurance policy with plaintiff Standard Mutual Insurance Company, a corporation. Defendants appeal.

On May 24, 1985, Mary Frances Petreikis, the 16-year-old daughter of Roy W. Petreikis, was hit by an automobile driven by Albert M. Olson and critically injured. As a result of the accident, Mary Frances has suffered permanent injuries, resulting in medical expenses far exceeding $100,000. Olson's automobile insurance coverage provided a liability limit of $15,000 per person. Petreikis' automobile insurance

policy provided for uninsured coverage up to $100,000, and the coverage would normally extend to the injuries received by Mary Frances. Basically, the trial court held that defendants could not collect under the uninsured provisions because they released claims against Olson upon the payment of the $15,000 limits of his automobile insurance policy without affording plaintiff the right to subrogate its claims against Olson for any payment it might make to defendants.

Section 143a—2 of the Illinois Insurance Code (Code) (Ill. Rev. Stat. 1987, ch. 73, par. 755a—2) provides for "Additional uninsured motorist coverage—Underinsured motorist coverage," and effective January 1, 1985 (Ill. Rev. Stat. 1985, ch. 73, par. 755a—2(7)), and all times since, section 143a—2(7) has provided:

"Subrogation against underinsured motorists. No insurer shall exercise any right of subrogation under a policy providing additional uninsured motorist coverage against an underinsured motorist where the insurer has been provided with written notice in advance of a settlement between its insured and the underinsured motorist and the insurer fails to advance a payment to the insured, in an amount equal to the tentative settlement, within 30 days following receipt of such notice." Ill. Rev. Stat. 1987, ch. 73, par. 755a—2(7).

Defendants contend, on appeal, that the trial court erred (1) in finding that section 143a—2(7) applied where the insurer expressly waived its subrogation rights, (2) in failing to find that the insurer was estopped from asserting its subrogation rights, (3) in finding that section 143a—2(7) controlled where a conflict existed between the procedure set forth in the statute and the procedure set forth in the insurance contract, and (4) in finding that the insureds did not comply with section 143a—2(7).

The evidence in the present action consists of the examination of Fred C. Ray, an employee of Standard Mutual Insurance Company, and 19 exhibits. Ray basically identified and explained the exhibits but also related to the timing of insurance policy endorsement changes relating to section 143a—2(7). At the time of the accident, May 24, 1985, there was no reference in plaintiff's automobile policy to section 143a—2(7). The relevant provisions in the Petreikises' policy provided:

"Underinsured Motorists Insurance is included subject to the following:

(a) The company will pay uncompensated damages which the insured or his legal representative shall be legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury, caused by acci-

dent and arising out of the ownership, maintenance or use of such underinsured motor vehicle.

The Company shall not be obligated to make any payment because of bodily injury to which this insurance applies until after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments of settlements.

\* \* \*

'Subrogation'

In the event of any payment under this insurance, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights."

Ray testified an endorsement incorporating the section 143a—2(7) provision had been adopted for the various policies by October 1985. The record does not include any evidence of such endorsements.

The exhibits establish the following chronology:

(1) May 24, 1985: The accident happened at 9:44 p.m., taking place on Ridgeland Avenue and 126th Place in Palos Heights, with Mary Frances and a boy, both pedestrians, being hit on the east side of the northbound lines by an automobile driven by Albert Michael Olson. A ticket was issued to Olson for violation of section 11—1003.1 of the Illinois Vehicle Code (Ill. Rev. Stat. 1985, ch. 95½, par. 11—1003.1), which charges drivers to exercise due care to avoid colliding with any pedestrian.

(2) May 30, 1985: The loss report by the insurance agent to plaintiff referred only to the medical coverage portion of the Petreikises' automobile insurance policy.

(3) July 10, 1985: The insurance agent forwarded Mary Frances' medical bills to plaintiff.

(4) August 12, 1985: A negligence action was filed in the circuit court of Cook County (case No. 85—L—18662) on behalf of Mary Frances against Olson. Attorney for Mary Frances is Anthony C. Scrementi.

(5) February 17, 1986: Letter by Scrementi to plaintiff, provides as follows:

"Please be advised that we have been retained to represent Mary Petreikis, a minor, for injuries she received on or about May 24, 1985, as a pedestrian struck by a motor vehicle.

Claim is hereby being made for payment under the medical pay provision and the underinsured motorist provision of policy #FD 833695 for the two automobiles insured by her father, Roy Petreikis. A copy of the face sheet of the policy is enclosed.

Claim is also being made under the applicable provisions of the homeowner's policy, number HD 725374, of her parents' Roy and Katherine Petreikis, a copy of the face sheet is enclosed.

Also enclosed for your convenience is a copy of the police report.

If you should be in need of any additional information in order to process these claims, please contact the undersigned."

(6) February 25, 1986: Letter from plaintiff (by C. Fred Ray) to Scrementi, provides as follows:

"We acknowledge yours of February 17th.

Enclosed is a copy of the E-140 Amendatory Endorsement which you will find self-explanatory and we paid our medical payments limits of $5,000.00 to the insureds on July 17th.

As you have pointed out we might have uninsured motorist coverage available provided proof can be established that Mr. Olson was uninsured. If you have any such evidence please present same to us along with an accounting of Mary's damages for our further attention.

If Olson had coverage but may have been limited to an amount less than our uninsured motorist limits, please advise in the event we may be exposed under the underinsured motorist coverage.

We will appreciate your further advice and with best regards remain ***."

(7) February 25, 1986: Letter by Ray to the investigating firm of Gay and Taylor, Inc., provides as follows:

"For your information we enclose a copy of the police report, insured's report and letter of February 17th from Attorney Scrementi.

We have paid what we believe to be the maximum due under the medical payments to the Petreikis people but if Olson is indeed uninsured, we may have uninsured or perhaps underinsured motorist coverage exposure.

We would like to have you contact Olson for his statement concerning not only the details of this occurrence but of course his insured status so that we will know what our exposure really is.

It would be a good idea to have a statement from our insured's daughter concerning the facts of the occurrence even though I am sure she will simply tell you what her lawyer tells her to. It does appear that she at least was extremely seriously injured and with a hospital bill of almost $60,000 alone, we can foresee some possible extreme exposure here.

We will await your report and with best regards remain *** ."

(8) March 6, 1986: Letter by Gay and Taylor to plaintiff notifying plaintiff that Olson's liability insurance limits were $15,000, and the name of Olson's insurance carrier was Prestige Casualty Company. This letter further stated:

"AGENT CONTRACT:

We contacted the Miller Agency at 123rd and South Cicero Avenue in Alsip, IL. This agency underwrites high risk and substandard business in the automobile area."

It went on to state:

"As of this date, the question arises in our mind, as to whether or not the claimant's attorney of record, who is now seeking indemnification from the Standard Mutual policy, will not turn his attention regarding the claimant against her own parents in reference to their homeowner's liability insurance. We make this reference as to when she reaches her majority, will she not bring suit against her own parents for their negligence?"

(9) March 17, 1986: Gay and Taylor phone conference with Scrementi.

(10) March 18, 1986: Letter from Gay and Taylor to Scrementi asking for a meeting with Mary Frances for purposes of taking a statement.

(11) April 18, 1986: Scrementi's letter to Gay and Taylor, provides as follows:

"In response to your letter of March 18, 1986, please be advised that our client is physically unable to give a statement at this time due to the severity of her injuries. If I can be of assistance in any other way, please give me a call.

Also, please be advised that we have made demand upon the Liability Carrier of the responsible party to tender the policy limits. Once that has been resolved, we will, in all likelihood, be pursuing an underinsured motorist claim with your principle [sic]. I shall keep you advised."

(12) April 30, 1986: Ray's letter to Scrementi, provides as follows:

"We acknowledge your letter of April 18th directed to Gay & Taylor, our adjusters.

When the primary carrier has tendered their policy limits, we will need proof of their policy limits, plus a copy of any investigative material you have which would provide us information upon which we can evaluate this entire claim and thereafter we will attempt an evaluation if we are required to do so.

We appreciate your cooperation and with best regards remain \*\*\*."

(13) September 11, 1986: "Indemnifying Release" to Albert M. Olson and Prestige Casualty Company, with consideration of $15,000, was executed by Roy Petreikis, as guardian of the estate of Mary Petreikis, a minor.

(14) December 8, 1986: "Order of Distribution, Severance and Dismissal" was entered in Cook County cause No. 85—L—18662.

(15) February 16, 1987: Draft for $15,000 was issued from Prestige Casualty Company on behalf of Albert M. Olson.

(16) April 24, 1987: Scrementi's letter to Ray, provides as follows:

"Pursuant to our telephone conversation of April 24, 1987, enclosed please find the following documents:

1. A copy of your letter dated April 30, 1986, requesting that we obtain the policy limits from the primary carrier and forward to you proof of the settlement, policy limits and extent of injury;

2. A copy of the face sheet of the policy issued by the primary carrier to Albert Olson indicating policy limits of $15,000.00;

3. A copy of the settlement draft from the primary carrier for the policy limits in the sum of $15,000.00;

4. A copy of partial special damages and reports regarding the condition of the insured's daughter, Mary Petreikis.

If additional information is required, please let me know and I will attempt to provide same. You have already tendered medical payments in the sum of $5,000.00. You or your adjusters, Gay and Taylor, may already have additional information regarding the care and treatment rendered to the insured's daughter, Mary Petreikis.

If the enclosed information is sufficient, please tender the sum of $85,000.00 payable to Roy Petreikis as guardian of the estate of Mary Ann [sic] Petreikis, a minor, and Cifelli, Baczynski & Scrementi, Ltd., attorneys, as payment under the underinsured motorist provision of Mr. Petreikis' policy with

limits of $100,000.00 less the $15,000.00 received from the primary carrier.

Thank you for your cooperation and assistance."

(17) April 30, 1987: Ray's letter to Scrementi, provides as follows:

"Thank you for your letter of April 24th with enclosures.

You did not send us any investigative material, nor did you send us any accounting of the doctors bills provided they are separate from the hospital charges and this material would help us get our file in order for an evaluation.

We have asked our attorney to review this matter and hopefully sometime shortly after May 13th we will be able to contact you further.

We do appreciate your cooperation and with best regards remain ***."

(18) May 13, 1987: Letter to C. Fred Ray from Scrementi sending additional materials, which included medical records and an accident report.

Plaintiff brings the present action under the declaratory judgment provisions of section 2—701 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—701). The relief sought was a declaration that defendants were not entitled to the underinsured motorist coverage because:

"13. The action of the Defendants in executing a release to Albert M. Olson has destroyed the Plaintiff's subrogation rights against Albert M. Olson for any payment to the Defendants under their underinsured motorist coverage. The Defendants have violated the subrogation provisions of their underinsured motorist coverage (Paragraph 3(e) of Part IV of the amendatory endorsement) which provides that 'the insured shall do nothing after loss to prejudice such (subrogation) rights.'

14. The Defendants did not give to Plaintiff either written or oral notice, and the Plaintiff had no knowledge that a tentative settlement had been reached by the Defendants with Prestige Casualty Company for payment of their policy limits prior to that settlement being consummated.

15. Plaintiff had no knowledge that the Defendants had reached a settlement with Prestige Casualty Company for payment of their policy limits prior to its consummation and therefore had no opportunity to advance a payment to the Defendants in an amount equal to the tentative settlement."

■■ ■ We first determine whether the Petreikises' insurance policy contains provisions inconsistent with the dictates of section 143a—

2(7) of the Code. Insurance policies should be construed as a whole, giving effect to every part, as far as possible. (*Hartford Accident & Indemnity Co. v. Case Foundation Co.* (1973), 10 Ill. App. 3d 115, 121, 294 N.E.2d 7, 12; *Konrad v. Hartford Accident & Indemnity Co.* (1956), 11 Ill. App. 2d 503, 526, 137 N.E.2d 855, 867.) Where the language in a policy is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. (*Hartford*, 10 Ill. App. 3d at 121, 294 N.E.2d at 12; *Banner Insurance Co. v. Avella* (1970), 128 Ill. App. 2d 471, 475, 262 N.E.2d 791, 793.) The Petreikises' policy contained the uninsured motorist insurance provision, freeing the insurer from making payments until after collection from other coverage has been exhausted. These provisions must be read with the subrogation provision, which provides "[t]he insured shall do nothing after loss to prejudice" the insurer's subrogation rights. These provisions are not inconsistent and, when construed together, require cooperation between the injured party and his or her insurer when settling with the tortfeasor. Section 143a—2(7) of the Code creates an additional burden on the insurer by requiring, upon receiving notice from the insured, to advance the amount of the settlement or waive subrogation rights. We find nothing inconsistent between the policy provisions and section 143a—2(7). We conclude plaintiff ordinarily was entitled, by the insurance policy provisions and by the statute, to notice of defendants' intent to settle with Olson.

Defendants contend plaintiff waived its right to the notice or were estopped by plaintiff's conduct from defending on the lack of notice defense. They also contend that their actions were sufficient to comply with the requirements of section 143a—2(7) and the policy provisions.

■■■ Generally, legislation to protect civil rights and govern contracts, not carrying criminal provisions, may be waived by those affected. (2A N. Singer, Sutherland on Statutory Construction §55.08 (Sands 4th ed. 1984).) A waiver is an intentional relinquishment of a known right. To constitute a waiver, the words or conduct of the insurer must have been inconsistent with its intention to rely on the requirements of the policy. *Florsheim v. Travelers Indemnity Co.* (1979), 75 Ill. App. 3d 298, 304, 393 N.E.2d 1223, 1229; see also 18 Ill. L. & Prac. *Estoppel* §21 (1956).

■■ Estoppel implies the prejudicial reliance of the insured upon some act, conduct, or nonaction of the insurer. An estoppel may be found even though the insurer neither intended to mislead, nor to relinquish its own rights. Nevertheless, to establish an estoppel, the insured must show that (1) it was in some manner misled by the acts or

statements of the insurer or its agents; (2) it relied on this conduct or misrepresentation; (3) such reliance was reasonable; and (4) it was prejudiced thereby. (*Florsheim*, 75 Ill. App. 3d at 304-05, 393 N.E.2d at 1229.) In *Florsheim*, the action against the insurer was not filed within the limitation period provided for by the insurance policy. The insurer had explicitly denied liability three months before the limitation period had expired. The trial court's finding of no waiver or estoppel, as to the limitation period defense, was affirmed.

As has been indicated, defendants, under the terms of the policy with plaintiff, could not prejudice plaintiff's rights to subrogation. The evidence of waiver or estoppel appears to come from two exhibits, exhibit No. 14 and exhibit No. 15.

Exhibit No. 14 is the April 18, 1986, letter from Scrementi to Gay and Taylor, which was forwarded to plaintiff. The second paragraph advises plaintiff of Scrementi's demand for Olson's policy limits, which were known by plaintiff and defendants to be $15,000. The intention to proceed against plaintiff under the Petreikis policy for the uninsured amount was indicated "[o]nce [the Olson limits] has been resolved." Exhibit No. 15 is the April 30, 1986, letter to Scrementi from plaintiff acknowledging receipt of the April 18, 1986, letter, and stating:

> "When the primary carrier has tendered their policy limits, we will need proof of their policy limits, plus a copy of any investigative material you have which would provide us information upon which we can evaluate this entire claim and thereafter we will attempt an evaluation if we are required to do so."

No mention is made of plaintiff's subrogation rights or the possible desire to proceed under section 143a—2(7) of the Code. Neither is there a specific waiver of plaintiff's subrogation rights.

Defendants cite, under the issue of estoppel, *National Discount Shoes, Inc. v. Royal Globe Insurance Co.* (1981), 99 Ill. App. 3d 54, 424 N.E.2d 1166. This case actually is concerned with the issue of waiver. A building burned, and the insurer paid the mortgage holder, and the balance to the listed insured. The insured, prior to the fire, had sold the property and attempted to assign to the plaintiff purchaser the insurance benefits. The insurance policy provided assignments were not valid unless given with the insurer's approval. The action arose when the plaintiff sued for the coverage. The plaintiff contended waiver of the insurance policy assignment clause was affected by the payment made to the mortgage holder. The appellate court held waiver did not exist for that reason, but went on to state:

> "Our conclusion that as a matter of law the insurer cannot be

considered to have waived the consent provision in its policy does not mean however that under no circumstances can this plaintiff recover on the policy. As already noted the purpose of the consent requirement is to protect the insurer against an unbargained for increase of risk. While we are aware that earlier cases have enforced the consent clause and automatically denied recovery where the purchaser failed to obtain the insurer's consent to the assignment, we are persuaded by the more recent cases that we should not place form over substance and enforce a forfeiture on technical grounds. If in fact the breach of the policy provision does not increase the insurer's risk (*Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co.* (5th Cir. 1976), 535 F.2d 287; *National American Insurance Co. v. Jamison Agency, Inc.* (8th Cir. 1974), 501 F.2d 1125), or if the insurer would have routinely approved the assignment had it been presented before loss (*University of Judaism v. Transamerica Insurance Co.* (1976), 61 Cal. App. 3d 937, 132 Cal. Rptr. 907), the plaintiff may still recover on the policy for its own loss." *National Discount*, 99 Ill. App. 3d at 61, 424 N.E.2d at 1171-72.

█ We recognize the possibility plaintiff's risk was not increased by defendants' actions. Olson very well may have been judgment proof, and the possible high risk status might so indicate. However, no specific evidence as to Olson's financial status was introduced. Also, no evidence was introduced indicating plaintiff would have routinely waived the subrogation rights.

The facts do not clearly indicate an intentional relinquishment of the plaintiff's right to subrogation. We cannot ascertain whether plaintiff actually intended for defendants to collect the Olson policy limits, granting Olson an absolute release, without specific approval from plaintiff. The trial court's decision as to waiver was not against the manifest weight of the evidence.

█ The question of estoppel is a more complicated issue. Regardless of plaintiff's intention, if there was conduct on plaintiff's part which misled defendants, and defendants reasonably relied on the misrepresentation to their prejudice, then estoppel should apply. (See *Florsheim*, 75 Ill. App. 3d at 304, 393 N.E.2d at 1229.) Illinois Law and Practice's position on this topic includes the following statements:

"Also, a party who prevents performance in accordance with the requirements of a contract, or who induces the opposite party to perform in a different manner, will not be allowed to insist on strict performance." (18 Ill. L. & Prac. *Estoppel* §29,

at 102 (1956).)

"Where a person stands by and sees another about to commit, or in the course of committing, an act infringing on his rights and fails to assert his title or right, he will be estopped afterward to assert it." (18 Ill. L. & Prac. *Estoppel* §30, at 102 (1956).)

(Also see *Artnell Co. v. National Broadcasting Co.* (1972), 4 Ill. App. 3d 970, 974, 282 N.E.2d 493, 495.) Estoppel can be triggered where there is prejudicial reliance based on the insurer's conduct. (*Salloum Foods & Liquor, Inc. v. Parliament Insurance Co.* (1979), 69 Ill. App. 3d 422, 429, 388 N.E.2d 23, 28; *Anderson v. Safeway Insurance Co.* (1973), 10 Ill. App. 3d 597, 295 N.E.2d 117 (abstract opinion).) *Salloum* also recognized "the modern view that an insurer must deal fairly and in good faith with its insureds." *Salloum,* 69 Ill. App. 3d at 433, 388 N.E.2d at 31.

 It would be error to say Scrementi's letter of April 18, 1986, was notice in advance of a settlement between defendants and Olson sufficient to meet the requirements of section 143a—2(7). The second paragraph of plaintiff's letter to Scrementi, dated April 30, 1986, made the statement: "When the primary carrier has tendered their policy limits, we will need proof of their policy limits." We find this statement was not sufficient to justify defendants proceeding with a complete settlement with Olson for his policy limits without further contact with plaintiff.

Subrogation rights, which possibly could provide plaintiff with an $85,000 reimbursement, can hardly be considered insignificant. Scrementi, as attorney for defendants, is charged with knowledge of the law and contract obligations surrounding the uninsured policy provisions. We know of no rule requiring the insurer's representatives to advise counsel for the insured of various legal requirements. As we have said, the insurer's right to subrogation was clear. The Ray letter of April 30, 1986, could well be read to suggest plaintiff would determine the propriety of any payment under the defendant's uninsured motorist clause when a settlement for the policy limits was *offered* by Olson's representatives. At that time, a decision to advance funds, pursuant to section 143a—2(7), may have been considered. We note Ray's letter referred to the *tender* of the policy limits, not the *receipt* of the policy limits, in settlement of all claims against Olson.

The facts do not necessarily indicate conduct on the plaintiff's part inducing defendants to act to their detriment, nor do they indicate plaintiff stood by, without giving warning, while seeing defendants about to commit an act detrimental to the plaintiff's interest.

The defendants did not establish their reliance on the plaintiff's letter in settling the Olson claim, without giving notice under section 143a—2(7), was reasonable.

Affirmed.

McCULLOUGH, P.J., and GREEN, J., concur.