BOLINGBROOK EQUITY I LIMITED PARTNERSHIP, Plaintiff-Appellant, v. ZAYRE OF ILLINOIS, INC., *et al.*, Defendants (Century Supply Company, Defendant-Appellee).

First District (5th Division)   Nos. 1—91—1312, 1—92—0432 cons.

Opinion filed August 27, 1993.—Rehearing denied October 15, 1993.

James K. Lennon and Kathryn E. Korn, both of DiLeonardi & Broihier, Ltd., of Des Plaines, for appellant.

Rosenthal & Schanfield (James M. Dash and Stephen P. Kikoler, of counsel) and Gorham, Metge, Bowman & Hourigan (Maureen A. McGuire and Marvin F. Metge, of counsel), both of Chicago, for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Plaintiff Bolingbrook Equity I Limited Partnership (the Partnership) seeks possession of 81,500 square feet of store space in a shopping center which it owns in Bolingbrook, Illinois. Defendant, Century Supply Company (Century), occupies this space as the claimed assignee of Zayre Illinois Corporation (ZIC). The Partnership is the successor in interest to the original lessor under a lease to Zayre of Illinois, Inc. (ZII), as lessee, dated August 18, 1971.

Initially, there were two separate actions in the trial court. First, the Partnership brought an action in the chancery division of the circuit court of Cook County challenging the lease assignment. Second, the Partnership brought an eviction action in the municipal division of Will County, the location of the shopping center. However, upon Century's motion, Judge Curry, the trial judge in the chancery action, required that the claim be filed in Cook County. Subsequently the two matters were consolidated in the chancery division of the trial court. The Partnership filed two separate appeals in this case; the first appeal is from the finding of summary judgment in favor of Century in the chancery action (appeal No. 1—91—1312), and the second appeal is from the finding of summary judgment in the municipal action (1—92—0432). The two appeals have been consolidated by this court; however, since the issues tendered by the two appeals involve different legal concepts, we address the two appeals separately.

APPEAL 1—91—1312

The first appeal concerns the following facts. On December 31, 1986, the Partnership acquired a shopping center then known as "Bolingbrook Commons." The largest store in this shopping center had been leased, by the predecessor owner, to defendant ZII under a written lease dated August 1, 1971 (the Lease). The Lease granted ZII the right to occupy 81,500 square feet of store space and also certain collateral rights in the shopping center as a whole, including a restrictive covenant limiting the businesses that other tenants could conduct. The store had been constructed by the original landlord according to ZII's specifications. The term of the Lease was for 25 years, after which the tenant, at its option, could renew for as many as four additional five-year extensions. Until early 1989, the leased premises were primarily occupied by a Zayre store. There is, however, a dispute as to the succession of the various Zayre entities.

Century maintains the following represents the succession of interests in the Lease: (1) on August 18, 1971, ZII entered a lease as tenant to rent the property at issue; (2) prior to June 1977, ZII assigned the tenant's interest in the Lease to Zayre Corporation (ZC); (3) on October 25, 1988, ZC assigned its interest to ZIC; (4) on August 11, 1989, ZIC executed an assignment to Century; (5) Century took possession of the premises and remains in possession as of this date. The Partnership disputes the validity of the purported assignment from ZC to ZIC as well as the validity of the purported assignment from ZIC to Century.

On June 3, 1977, the original landlord and ZC executed "Amendment B" to the Lease, which identifies ZC as "Tenant" and which recites that "Tenant is the successor to and present holder of the tenant's interest in and to the Lease." The substance of "Amendment B" permits the tenant to erect and maintain an outdoor sales area within the shopping center. This document is the only indication of an assignment from ZII to ZC. In their answer to the amended complaint, ZII, ZIC and Ames Department Stores, Inc. (Ames), alleged that ZII was "merged into Zayre [ZC] in 1977."

On October 25, 1988, ZC and ZIC executed an "Assignment and Assumption Agreement" which purports to assign ZC's interest in leases for 47 separate Zayre store locations (including the store in Bolingbrook) to ZIC. Thereafter, the Partnership received a letter dated October 25, 1988, written on ZC stationery and signed by ZIC, which refers to the Lease and states "we hereby assume to and agree with you that we will perform and observe all of the terms and conditions in said Lease contained to be performed and observed by Tenant."

Throughout 1988, both before and after October 25, 1988, the Partnership continued to receive rent checks drawn on accounts of "—Zayre Framingham, MA 01701." After November 22, 1988, the Zayre rent checks were drawn on a different bank, the words "Stores Division" appeared in small print beneath the word "Zayre," and a different corporate officer signed the checks. Through July 1989 the Partnership continued to receive similar "Zayre" checks for payment of rent.

The Partnership (through its general partner and managing agent, the Hinman Company) received a letter dated January 26, 1989, from defendant Ames concerning the Lease. The letter states that "Ames *** has acquired the Zayre Discount Store chain and has assumed the tenant responsibility under the Zayre leases," that Ames planned to close the Bolingbrook store, and that Ames was "negotiating with prominent local, regional and national retailers to occupy some or all of our vacated store space." The letter concludes by stating that "[the Partnership] may want to participate in the purchase of our leasehold interest. In that event, we will be pleased to consider a written proposal from you to buy our lease interest, if promptly received."

By letter dated January 27, 1989, Century suggested to Ames that it would be interested in acquiring the lease to the Bolingbrook Zayre store space. Century proposed an acquisition price of $167,000 if Ames could satisfy several conditions and contingencies, including Century's need to have the right to make numerous physical altera-

tions to the premises and the availability of rezoning or a special use from the Village of Bolingbrook "to allow Century to use a majority of the premises for warehouse purposes." Century indicated its proposal would probably require approval or consent of the owner as well as the issuance of permits to perform the work by required governmental authority. Century's initial proposal was also subject to satisfactory results of a test of the load-bearing capacity of the ground floor of the store, to meet Century's needs. The proposal was conditioned upon the approval of Century's attorney of the Lease itself, which Century had not yet seen. Century wrote: "In this regard we look forward to receiving a true and correct copy of the lease as soon as possible." The letter concluded by stating that "[u]nless accepted, the offer contained in this proposal will automatically terminate without notice on March 14, 1989." The Partnership was not shown this letter, and was not advised of its specific terms, until after this suit was filed.

The first response Century received regarding its proposal to Ames came in a telephone call from Ames on February 24, 1989.

The Ames representative said that the Century offer was generally acceptable. Ames had not yet provided a copy of the Lease to Century; in fact, Century did not obtain a copy of the lease to review until March 15 or 16 (after the date when Century's proposal, by its terms, automatically terminated). Century's vice-president, Paul Spiewak, Jr., testified that "it seemed illogical that he [Robert Masson of Ames] wouldn't show me the Lease. But he didn't." On April 4, 1989, Ames sent its first written "acceptance" of Century's "offer." The acceptance was subject to Century's "execution of a Leasehold Purchase Agreement," the terms of which were eventually rejected by Century.

By letter dated February 13, Ames wrote to the Partnership on Ames letterhead (hereinafter referred to as "the Ames letter") stating: "In accordance with Section 17.2 of [the] lease, you are hereby advised that we intend to assign our interest under this lease for use as a home improvement sales and stockroom, especially tile products." Section 17.2 of the Lease provides:

> "During the term of this lease *Tenant shall not assign its interest in this lease* or sublet more than fifty per cent (50%) of the floor area of the main building *without first giving the Landlord notice of the intended assignment or intended subletting and the nature of the business organization and the effective date of the intended assignment or subletting.* If within twenty (20) days after the giving of such notice by Tenant to

Landlord, Landlord shall give notice to Tenant that it elects to terminate the term of this lease as of the intended date of said assignment or subletting, then the term of this lease shall terminate as if said intended date was the date originally fixed for the termination hereof. In the event that landlord shall elect to terminate the term of this lease pursuant to this Section 17.2, then landlord shall, upon the date the term of this lease shall so terminate, pay to Tenant an amount equal to the product of (i) the invoiced cost to Tenant of fixtures initially installed in the Demised Premises at or about the commencement of the term of this lease plus the cost of leasehold improvements to the Demised Premises at or about the commencement of the term of this lease plus the cost to Tenant at any time during the term of this lease, multiplied by (ii) a fraction the numerator of which shall be equal to the number of years (and fraction of a year) then remaining in the unexpired balance of the original term at the time of such termination pursuant to this section 17.2 and the denominator of which shall be twenty-five (25). Notwithstanding any assignment of Tenant's interest in this lease or any subletting of the whole or any part of the Demised Premises, Tenant shall remain primarily liable for the performance of all agreements of Tenant hereunder." (Emphasis added.)

The Ames letter further stated that "This Assignment will be effective on or before April 27, 1989. Please advise within twenty (20) days from the date hereof of your election to terminate this lease in accordance with the provisions of Section 17.2. Upon receipt of such notice we will calculate the amount of reimbursement due us under said Section 17.2."

On February 28, Michael Mair (Mair), a limited partner in the Partnership who also had managerial responsibilities in connection with the shopping center, wrote to Ames, stating:

"In your request for assignment and sublease, you indicated a proposed tenant for use as a home improvement sales and stock room. We have also been notified by the Village of Bolingbrook that this would require a change in zoning necessary to permit this warehousing. Certainly your proposed change in land use has not only a detrimental effect on the percentage sales clause in Article VII of this Lease, but would also make the balance of the shopping center untenable.

Until we are in receipt of a sublease agreement in recordable form clearly defining the use and compliance of this lease

with building designs and zoning requirements, we are not in a position to accept or reject your request for assignment or sublease. Notwithstanding, Article [17.2] requires Ames Department Stores, Inc. to remain liable for the full performance of the lease, which language should be contained in any request for sublease."

The Partnership's request for information was not answered.

The affidavit of Mair was submitted in opposition to Century's summary judgment motion. Attached to his affidavit are copies of nine pages of handwritten notes reflecting telephone conversations with Robert Masson (Masson), who identified himself as an employee of Ames with responsibility for the lease of the Bolingbrook Zayre store premises. Mair stated that the general subject of all the conversations, which he recalled independently as well as with the aid of his contemporaneous notes, was that Masson was doubtful that Ames would successfully come to terms with Century, and that Ames would prefer to "tear up the lease," thereby relieving Ames of the ongoing responsibility that it would have even if an assignment to Century could be accomplished. After the Partnership's February 28, 1989, letter to Ames went unanswered, Mair learned from Century, whom he knew to be interested in the Zayre space, that it wished to use substantial amounts of the Zayre space for warehousing. He also learned that Century's largest existing store location was only 46,000 square feet, in contrast to the 81,500 square feet of the Zayre store, the majority of which was not used as a retail showroom. Century further explained to Mair that it intended to use much of the Zayre space in connection with a "distribution center" business, in which Century would sell at wholesale to out-of-State retailers. Mair stated that the Partnership was not a participant in discussions between Ames/and or Century and the Village of Bolingbrook (Village) concerning whether a zoning change would be required for Century's intended use, and if the Village had required a zoning change, the Partnership would have opposed it, because it would have devalued its property. Finally, Mair noted that during late 1988, Century had made a proposal to lease a vacant grocery store at Bolingbrook Commons, a proposal which the Partnership would have welcomed if acceptable terms could have been negotiated; however, Century did not seriously pursue negotiations for this space after it became interested in occupying the Zayre space.

In a letter dated March 6, 1989, Jeff Chrystal, the marketing/leasing agent for the Partnership, wrote to Paul Speiwak, Jr., of Century, thanking him for showing Century's operation in Itasca as well as stating: "I feel safe to say on Mr. Hinman's behalf that Century Tile

is an ideal prospect for the Zayre space and a tremendous initial step toward our goal of establishing a Home Improvement Center theme at the Bolingbrook location."

Mair's notes indicated he spoke with Bob Masson on March 20, 1989. His notes stated in part that: "If we were to part ways [with] Ames (no cost) Bob [Masson] would recommend tearing up Lease."

On March 24, 1989, Mair wrote Century thanking Paul Spiewak, Jr., "for taking the time to meet and discuss with us the opportunity available to us both in a Home & Design Center concept for Bolingbrook, Illinois."

On April 13 Mair wrote to Fred Horacek, vice-president of real estate for Ames, summarizing information that the Partnership had gathered in conversations with Century and the Village of Bolingbrook. This letter specifically objected to Century's proposed use of the Zayre store space for warehousing, and noted that the Lease was for the sole purpose of conducting department store activity in retail business. The letter concludes by stating that should Ames submit a request for assignment to a complimentary department store user, the Partnership would notify Ames of its consent or termination of the Lease.

On the same date, Mair wrote to Paul Spiewak, Sr., president of Century. This letter states: "[W]e have notified Ames *** that their request for an assignment was incomplete and not in compliance with the lease" and that the Lease did not permit an assignment to a warehouse for four enumerated reasons. This letter further states that the Partnership would specifically disapprove a change in zoning for warehouse use and would not consent to the installation of "truck docks at the storefront area."

Mair's notes indicate that during the following weeks, Masson continued to tell the Partnership that Ames could not agree with Century on the terms of any Lease assignment. On April 28, 1989, the day after the "effective date" mentioned in the Ames letter, Mair's notes state: "Bob said Ames recv'd Assignment signed by Century. Said 'It ain't over 'til the fat lady sings, and she ain't sung.'" On May 3 Masson told Mair that he thought "the Century deal will blow up this week," because Century and its attorneys wanted unreasonable requirements, and "Ames can't live with the requirements Century is imposing." On May 25, 1989, Masson said that Ames had made "no progress with Century" and offered to terminate the Lease for $75,000.

On May 9, 1989, Century wrote to the mayor of Bolingbrook that "Century is now ready to establish that our intended use is allowable

under Bolingbrook zoning ordinances," thus attempting to satisfy the zoning condition in its initial proposal. On June 7, 1989, a Bolingbrook village planner sent Century a letter indicating that the information and plans regarding the proposed facility in Bolingbrook had been reviewed and the proposed use would comply with the requirements of the Village's zoning ordinance as long as the primary use was retail sales. The plans referred to are not in the record.

On July 7, 1989, ZIC, as seller, and Century, as purchaser, signed the "Leasehold Purchase Agreement." This agreement includes 10 "Conditions to the Obligations of Purchaser," and two "Conditions to the Obligations of Seller." Specifically, Century had no obligation to close until the Partnership's objections had been resolved. However, Century retained the right to waive performance of any of the conditions. Paragraph 4(a)(ii) of the lease purchase agreement between Century and ZIC provides that the following condition must be met or waived prior to closing:

> "No action or proceeding before any court or governmental agency *** shall have been *** threatened by Landlord wherein an unfavorable judgment, decision, decree or order would prevent the consummation of the transactions contemplated by this Agreement or materially affect Purchaser's right to own, operate or control the leasehold premises ***."

Century and Ames had each been advised by the Partnership prior to this date that the Partnership would not recognize any assignment pursuant to the Ames letter. Other requirements before Century would close included reasonable assurances that Century would obtain any required permits.

On July 17, 1989, the Partnership's attorney, James Lennon, sent a letter to Ames, by overnight mail, with a copy to Century, reiterating the Partnership's objections to an assignment to Century after the Partnership had received "conflicting oral representations as to how Century Supply would use the leased premises" in response to the Partnership's February 28, 1989, letter request for information. The Partnership maintained that none of the correspondence it had received constituted sufficient notice of "the nature of the business to be conducted."

On July 31 the scheduled closing date, Century's attorney, Marvin F. Metge, wrote to Masson of Ames and explained that Century would not close as scheduled for five enumerated reasons. With respect to the Partnership's objections, Century's attorney wrote:

> "Action is threatened by the Landlord which might materially affect Century's right to own, operate and control the leasehold

premises ***. As a basis for waiving this condition of the closing, Century will require a further indemnity agreement from Ames in favor of the title insurer covering attorneys' fees and costs of defending against an action if brought by the Landlord."

Century apparently decided to waive its right to refuse to close on the basis of the Partnership's challenge to the validity of any assignment. On August 9 Century executed an "Assignment of Lease" which was thereafter executed by ZIC on August 11. On that same date, ZIC, Ames, Century and Chicago Title Insurance Company executed a "Limited Indemnity Agreement" in which the parties acknowledged that "The Landlord *** disputes the validity of the Assignment of lease from [ZIC] to Century and has threatened action." In this agreement, Chicago Title agreed to issue a title insurance policy "without exception or reservation with respect to a claim or threatened action by Landlord" and ZIC and Ames agreed to indemnify Chicago Title for attorney fees and costs incurred in defending such a claim, up to the limit of $167,000, *i.e.*, the same amount Century had agreed to pay ZIC under the lease purchase agreement. Chicago Title waived any subrogation rights against ZIC and Ames.

Shortly after the closing, Century took possession of the Zayre store. The Partnership received a copy of the document entitled "Assignment" on August 16, 1989.

On August 16, 1989, the Partnership sent a letter to ZII c/o Ames stating that possession of the leased "premises is not to be assigned or delivered to any third party unless or until the provisions set forth in" section 17.2 of the Lease have been fully complied with. The letter demanded possession of the Zayre space be returned to ZII forthwith, and that the third party occupying the subject property vacate said property immediately.

Also on August 16, 1989, the Partnership sent a letter to Ames acknowledging receipt of building remodeling plans of the Zayre space, but stating the Partnership's disapproval of the plan for remodeling pursuant to article 9.1 of the Lease. The Partnership wrote to Century on August 23, 1989, stating that although Century's attempt to assume the Lease had not been fully established, nor had the Partnership consented to any assignment of said Lease, Century should be notified of the review and disapproval of any remodeling indicated by Century's drawings.

By letter dated August 30, 1989, the Partnership notified ZIC, ZII, and Ames of its election to terminate the Lease under section 17.2, stating: "notice is hereby given that the landlord elects to termi-

nate the aforementioned lease following receipt of the assignment of lease dated August 11, 1989 and received August 16, 1989 which operates as a notice of Assignment effective September 4, 1989."

On August 31, 1989, the Partnership initiated the chancery action to obtain emergency injunctive relief against the demolition and alteration of the former Zayre store. The Partnership named as defendants ZII, ZIC, Ames, and Century. The Partnership also sought a declaration that the purported assignment from ZIC to Century was not effective and requested both injunctive relief against Century's continued possession of the premises and money damages for waste occurring due to Century's alleged unauthorized alterations. The injunction was denied.

On January 10, 1990, the Partnership filed an amended complaint which sought possession of the subject store, a preliminary and permanent injunction to prevent further alteration to the Zayre premises and to require restoration thereof, as well as damages for waste. The amended complaint also named ZC (as a guarantor of the obligations of ZII under the Lease) as an additional defendant.

On May 22, 1990, Century moved for summary judgment in its favor and against the Partnership on counts I and II of the amended complaint. The Partnership objected to proceeding with the summary judgment motion in light of the fact that, in April 1990, defendants Ames and ZIC had filed bankruptcy petitions, and the automatic stay imposed by Federal law (11 U.S.C. §362 (1988)) prevented the Partnership from seeking relief against Century that would adversely affect the petitioning debtors. On June 14, 1990, the trial court ordered the parties to proceed with the briefing and argument of Century's summary judgment motion.

On August 6, 1990, the trial court granted summary judgment in favor of Century. The transcript of proceedings of August 6, 1990, reveals that the trial judge specifically found: (a) Ames' notice of intended assignment solicited the Partnership's determination within 20 days of the Partnership's election to terminate the Lease under section 17.2; (b) The Partnership's response to Ames' notice of intended assignment was not in compliance with section 17.2 of the Lease; and (c) the Partnership's continued acceptance of rent from the successive corporations which took over the original lessee's obligations works as a waiver against the Partnership. Century remains in possession of the premises.

The August 6, 1990, order was not a final and appealable order; however, on March 26, 1991, the court entered an order finding that, pursuant to Illinois Supreme Court Rule 304(a), "there is not just rea-

son to delay" appeal from the August 6, 1990, order. (134 Ill. 2d R. 304(a).) The Partnership filed this timely appeal. Century is the only defendant that has filed an appearance on appeal.

The Partnership presents three issues for review under appeal No. 1—91—1312: First, the Partnership argues its tenant could not assign the lease without complying with section 17.2 of the Lease; second, the Ames letter did not comply with section 17.2 of the Lease; and third, the Partnership argues it did not waive any defects in the attempted assignment of the Lease from ZC to ZIC. The Partnership seeks a reversal of the trial court's order granting summary judgment in favor of Century and remandment to the trial court for further proceedings.

For the following reasons, we affirm the trial judge's grant of summary judgment in Century's favor.

A motion for summary judgment should only be granted where the pleadings, depositions, and admissions on file, together with the affidavits, if any, disclose that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005; *Sons v. Taylor* (1991), 219 Ill. App. 3d 923, 925, 579 N.E.2d 1281; *Breeze v. Payne* (1989), 181 Ill. App. 3d 720, 726-27, 537 N.E.2d 453, 458.) The court must construe the pleadings, depositions and affidavits most strictly against the movant and liberally in favor of the nonmovant. *Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 522, 434 N.E.2d 50, 52.

The use of summary judgment is encouraged under Illinois law as an aid to the expeditious disposition of a lawsuit. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867.) The determination that summary judgment is appropriate will not be reversed absent an abuse of the trial court's discretion such that the plaintiff's right to fundamental justice is violated. (*Choi v. Commonwealth Edison Co.* (1991), 217 Ill. App. 3d 952, 578 N.E.2d 33.) Summary judgment is appropriate where the issue before the court is the construction of the provisions in a contract. *Chicago Title & Trust Co. v. Baskin Clothing Co.* (1991), 219 Ill. App. 3d 726, 731, 579 N.E.2d 1045.

We first address the issue of whether there was a valid assignment from ZC to ZIC, for if that assignment is invalid, ZIC would have had no interest to subsequently assign to Century. The Partnership argues that it did not waive the admitted defect in the attempted assignment from ZC to ZIC. Century asserted in the trial court that the Lease had previously been assigned from ZII to ZC, and from ZC to ZIC. Century did, however, concede that the assignment from ZC to ZIC "does not literally comply with the requirements of Para-

graphs 17.4 and 17.5 of the Lease." Paragraphs 17.4 and 17.5 of the Lease permit assignments to affiliated corporations only if an assignment and assumption agreement, in recordable form, is delivered to the landlord within 90 days of the date of the assignment, and this did not occur after the attempted assignment from ZC to ZIC.

Century maintains that ZC assigned its interest as tenant under the Lease to ZIC by a certain assignment dated October 25, 1988. There is no dispute that a copy of that assignment was sent to the Partnership, as landlord, on or about October 25, 1988. The October 25, 1988, letter to the Partnership was written on ZC letterhead and signed by ZIC. The letter states: "we hereby assume and agree with you that we will perform and observe all of the terms and conditions in said Lease contained to be performed and observed by Tenant."

Century argues that although the assignment does not literally comply with the requirements of paragraphs 17.4 and 17.5 of the Lease, there is no question that the Partnership accepted the assignment. The Partnership accepted rent payments from or on behalf of ZIC and otherwise dealt, without objection, with ZIC as the successor to ZC.

On February 28 Michael Mair, a limited partner in the Partnership who also has managerial responsibilities in connection with the shopping center, wrote to Ames regarding the request to assign the Lease. He closed the letter by stating:

> "Notwithstanding, Article [17.2] requires Ames Department Stores, Inc. to remain liable for the full performance of the lease, which language should be contained in any request for sublease."

Century also points to a letter from the Partnership's counsel to Ames dated July 17, 1989, stating that the Partnership "will neither consent to the proposed assignment to Century nor terminate the lease until it receives satisfactory assurances as to Century's proposed use of the premises." The letter further indicates that the Partnership's counsel was prepared to "take whatever legal action is necessary to protect our client's interests fully in the event Ames attempts to place Century Supply in possession without the Partnership's express written consent, or if it otherwise violates the Lease."

The transcript of proceedings of August 6, 1990, reveals the trial court found:

> "[The Partnership] suggests that Ames and the multiple Zayre Corporations are not indeed the appropriate parties to be making this notification of intended assignment. The receipt of rental payments from the successive corporations which took

over the original lessee's obligations to my view work as a waiver against the landlord who now protests the lack of formality in presenting successive assignment documentation as per the lease.

The [Partnership's] acceptance of the rent is inconsistent *** with its new belated claim of breach. The [Partnership's] February 28, 1989, letter to Ames makes clear that the [Partnership] looks to Ames, quote, to remain liable for full performance of the lease, end quote. Clearly this language is not language of protest to Ames succeeding the Zayre tenancy."

A waiver is an intentional relinquishment of a known right. (*Standard Mutual Insurance Co. v. Petreikis* (1989), 183 Ill. App. 3d 272, 280, 538 N.E.2d 1327.) It is well established that restrictions against the assignment of a lease are intended solely for the benefit of the lessor. (*Kaybill Corp. v. Cherne* (1974), 24 Ill. App. 3d 309, 319, 320 N.E.2d 598.) In the instance where a tenant has attempted to assign a lease in contravention to its terms, the assignment is not void, but merely voidable by the landlord and, if the landlord does not elect to treat the leasehold as void, the requirements of the lease regarding assignment are deemed waived. *Woods v. North Pier Terminal Co.* (1985), 131 Ill. App. 3d 21, 23-24, 475 N.E.2d 568, 570.

■ We agree with the trial court's reasoning and find that the trial court properly found that the assignment from ZC to ZIC was valid.

The Partnership argues the Lease prohibits the tenant assigning the lease without first complying with section 17.2. Century does not dispute this contention. What is disputed, however, is whether ZIC satisfied the predicate conditions to an assignment set forth in section 17.2 of the Lease. The Partnership does not argue the *per se* invalidity of the Ames letter, but rather maintains the Ames letter did not comply with section 17.2 of the Lease. Conversely, Century maintains all the predicate conditions to a valid assignment were satisfied.

Section 17.2 permits the tenant to assign the Lease if and when the tenant has given the landlord notice of the "intended assignment" setting forth the nature of the business organization and the "effective date of the intended assignment." The landlord has 20 days after the giving of such notice from the tenant to elect either to acquiesce to the assignment or to terminate the Lease. The Partnership claims the Ames letter fails to comply with section 17.2 in that: (a) the letter was premature; (b) the letter misrepresented the nature of the business to be conducted by Century; (c) the effective date in the Ames letter was arbitrarily selected by Ames; (d) the Ames letter was not a

notice "by tenant" as required by the Lease; and (e) even if any one of the aforementioned deficiencies would not establish that the eventual assignment to Century violated the Lease, the cumulative impact of these errors and omissions required a finding that the Partnership did not receive the required notice.

When ruling on the motion for summary judgment the trial court made the following findings. On February 13, 1989, Century wrote to advise the Partnership of its intent under section 17.2 to assign its interest in the shopping center to others without giving the name of the intended assignee, but that the notice did inform the Partnership that the new use would be "home improvement, sales and stockroom, especially tile products." The notice further informed the Partnership that the assignment would be effective on or before April 27, 1989. The February 13, 1989, Ames letter solicited, according to section 17.2 of the Lease, the Partnership's determination within 20 days of Century's letter of the Partnership's election to terminate the Lease under section 17.2. The Partnership's response on February 28, 1989, was not in compliance with section 17.2, in that it neither exercised the option to terminate nor did it accept the assignment proclaimed in the Ames letter. Although the Partnership characterized its February 28, 1989, letter to Ames as a requirement for more information, the letter instead demanded "a sublease agreement in recordable form," something that is not called for or anticipated by section 17.2. The Partnership indicated that it would await the arrival of said sublease agreement before exercising the section 17.2 option to accept or reject the assignment, all of this notwithstanding the clear and obvious language that the acceptance or rejection of the assignment was required within 20 days. The trial court noted the language "Tenant shall not assign without notice of intended assignment" contained in section 17.2 contemplates that the notice to the landlord shall precede the actual assignment and that nothing in section 17.2 contemplates the landlord will be an active player in the negotiations a tenant may have with potential assignees.

First, the fact that an assignment was intended is clearly and distinctly set out by the notice "you are hereby advised that we intend to assign our Lease." Secondly, it describes essentially Century's business for use as a home improvement sales and stockroom, especially tile products. Finally, it provided the date the intended assignment would be effective April 27, 1989. As we have previously stated, the Partnership's February 28, 1989, letter stated: "Notwithstanding, Article [17.2], requires Ames *** to remain liable for the full performance of the lease, which language should be contained in any request

for sublease." We find the Partnership's argument at this time that Ames was not the proper party to give notice of the intended assignment to be without merit.

The trial judge correctly concluded that the notice complied with the requirements of the Lease and he therefore correctly granted Century's motion for summary judgment on that issue.

APPEAL 1—92—0432

In appeal No. 1—92—0432, the Partnership, without waiving its position that the trial court's findings challenged in appeal number 1—91—1312 were in error, requests reversal of the December 19, 1991, order granting Century's second motion for summary judgment and denying the Partnership's cross-motion for summary judgment.

The facts relevant to this appeal are as follows.[1] Century took possession of the former Zayre store in Bolingbrook Commons on August 11, 1989, its claim to possession based upon an assignment executed by ZIC. The assignment agreement between ZIC and Century expressly provides that it is made "subject to all of the terms, covenants and conditions of the Lease." Section 17.2 of the Lease provides in pertinent part:

"Notwithstanding any assignment of Tenant's interest in this lease or any subletting of the whole or any part of the Demised Premises, Tenant shall remain primarily liable for the performance of all agreements of Tenant hereunder."

On April 25, 1990, ZIC filed a petition under chapter XI of the Federal bankruptcy law. ZIC was one of more than 50 related corporations that filed such petitions. The petitions were consolidated as *In re Ames Department Stores, Inc.* (S.D.N.Y. 1993), 150 Bankr. 107. Prior to June 24, 1990, which was the 60th day following the filing of these petitions, the debtors joined in a motion seeking an extension of time in which to assume or reject certain leases of nonresidential real property. The Bolingbrook, Illinois, lease at issue here was specifically listed in an appendix to this motion as a lease for which the debtors sought an extension of time. Specifically, as to all such leases, the debtors requested that their time be extended until the date of confirmation of a plan of reorganization. The bankruptcy court's ruling on this motion established a schedule under which interested parties could move to shorten the time during which specific assumption-re-

---

[1]Century is the only defendant involved in this appeal.

jection decisions would be required, but otherwise granted the requested extension of time.

The bankruptcy court thereafter ordered ZIC to assume or reject the Bolingbrook Lease on or before September 15, 1990. Notwithstanding ZIC's prior efforts to obtain extensions of time relating specifically to this Lease, ZIC's bankruptcy counsel wrote to the Partnership's counsel two days before the September 15, 1990, deadline, stating:

> "Zayre Illinois Corp. ('ZIC' or the 'Debtor-in-Possession') believes that, prior to bankruptcy, there was a valid and lawful assignment (the 'Century Assignment') of its interests in the above-referenced lease (the 'Bolingbrook Lease') with your client, Bolingbrook Equity Supply Co. ('Bolingbrook Partners'), to Century Supply Co. ('Century'). Accordingly, there is no assumption or rejection decision to be made at this time by the Debtor-in-Possession with respect to the Bolingbrook lease. By copy of this letter we are so informing the [Bankruptcy] Court and counsel for Century.
>
> This notice is not intended to alter the rights or obligations of any interested party under the Bolingbrook Lease. Further, the Debtor-in-Possession reserves all its rights, including any right promptly to assume or reject the Bolingbrook Lease should a default by Century under the Bolingbrook Lease, or other circumstances, including but not limited to a judicial determination that the Century Assignment was invalid or otherwise unlawful, result in Debtor-in-Possession being in a position to assume or reject the Bolingbrook Lease pursuant to 11 U.S.C. §365."

ZIC failed to either specifically assume or reject the Lease on or before September 15, 1990.

The Partnership demanded that Century vacate the former Zayre store premises by notice dated September 18, 1990. Century did not comply with the Partnership's demand, and the Partnership filed a supplemental complaint in the municipal division of the circuit court asserting that since ZIC did not "assume" the Lease in its bankruptcy case, the Lease was "deemed rejected" under section 365(d)(4) of the Bankruptcy Code. The supplemental complaint noted that ZIC had filed for relief under chapter XI of the Federal bankruptcy laws and that the resulting reorganization proceedings remained pending. The Partnership sought possession of the store premises (count I) and damages for Century's willful holding over after receipt of written notice to vacate (count II).

Without answering the supplemental complaint, Century filed a motion for summary judgment. The Partnership (1) filed a cross-motion for summary judgment on count I; (2) sought the entry of an order restoring possession to the Partnership; (3) sought a finding of default on the claim for damages alleged in count II because Century had failed to answer or otherwise plead to the complaint; and (4) requested a hearing on the amount of such damages. Following briefing and oral argument on these motions, the trial court granted summary judgment for Century and denied the Partnership's cross-motion for summary judgment on the issues raised in the supplemental complaint. The trial court stated that the assignment made clear that at the time of the bankruptcy ZIC was not the lessee as contemplated by that act and that the assignment provided no reversionary interest for ZIC.

The Partnership then filed this second appeal (No. 1—92—0432).[2] The Partnership argues the trial court erred in granting summary judgment in favor of Century and raises three issues for review: (1) whether the trial court erred in finding that ZIC had no interest in the Lease; (2) whether the trial court erred in finding that ZIC would have had no remaining rights under the Lease in the event of a default by Century notwithstanding its continuing obligations to the Partnership; and (3) whether the trial court erred in refusing to grant the relief provided to a landlord by the 'United States Bankruptcy Code in the event that a lease of nonresidential real property is "deemed rejected."

The entry of summary judgment is appropriate if the pleadings, depositions and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005.) The court will grant summary judgment where the pleadings and other evidence raise no triable issue of material fact and the movant is clearly entitled to judgment. *Chicago*

---

[2]Had we reversed the summary judgment order at issue in No. 1—91—1312, either because ZIC was not the tenant, or because the ZIC-Century assignment did not comply with the Lease, it would not have been necessary to resolve the issues raised in appeal No. 1—92—0432, because Century's only claim to be entitled to possess the premises is as ZIC's assignee, and the failure of that claimed assignment would have terminated Century's claim to possession. However, since we have affirmed the summary judgment order in No. 1—91—1312, we must address the merits of No. 1—92—0432.

*Title & Trust Co. v. Baskin Clothing Co.* (1991), 219 Ill. App. 3d 726, 579 N.E.2d 1045.

Summary judgment is appropriate where the issue before the court is the construction of the provisions in a contract. (*Chicago Title & Trust Co.*, 219 Ill. App. 3d at 731.) The pleadings and evidence before the court must be construed strictly against the movant and liberally in favor of the nonmovant. *Village of Fox Lake v. Aetna Casualty & Surety Co.* (1989), 178 Ill. App. 3d 887, 903, 534 N.E.2d 133.

■ Section 365(d)(4) of the Bankruptcy Code provides:

"Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property *under which the debtor is lessee* within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60 day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor." (Emphasis added.) 11 U.S.C. §365(d)(4) (1988).

The Partnership argues since ZIC neither assumed nor rejected the Lease, it was "deemed rejected" as a matter of law and, as a consequence of a lessee's rejection, the landlord gains the immediate right to possession, said right to immediate possession not having been diminished by the fact that a party other than the rejecting debtor is in possession. The Partnership argues since ZIC was the tenant when it executed the assignment agreement with Century, it remained the tenant and primary obligor thereafter and ZIC's status as "tenant" establishes that it was also a "lessee" under the Bankruptcy Code, so that Century's contractual undertaking to "fully and punctually pay, perform and observe all of the terms, covenants and conditions of the Lease" created a new obligation to ZIC, not to the Partnership, and did not release ZIC from its independent, primary obligation as "tenant" to perform its obligations to the landlord. Thus, the Partnership argues the assignment did not terminate ZIC's interest in the Lease, and ZIC therefore had the right to assume or reject the continuing obligations which the Lease represented.

Century maintains that the Lease was never part of ZIC's bankruptcy estate and, therefore, as a matter of law could not have been assumed or rejected, because by its terms, section 365(d)(4) applies only to leases under which the debtor ZIC was the lessee on the date of the filing of its bankruptcy petition. Century contends that ZIC had assigned the Lease to Century more than eight

months prior to the filing of the bankruptcy petition and, accordingly, was not the lessee on the date of such filing. Century maintains it is the lessee and ZIC cannot affect Century's rights or interest under the Lease. Century further contends that ZIC has no "reversionary interest" in the Lease. Century maintains that the assignor of a lessee's interest under a lease (such as ZIC) does not retain sufficient interest to make it the "lessee" as that term is used in section 365(d)(4) of the Bankruptcy Code. (See *In re Southern Motel Associates, Ltd.* (M.D. Fla. 1987), 81 Bankr. 112; *In re Gainesville P-H Properties, Inc.* (M.D. Fla. 1988), 87 Bankr. 709.) However, the original tenant in the above-related cases had assigned its entire interest and had retained "no interest" in the leases.

The Partnership also asserts that ZIC itself implicitly recognized its continuing status as lessee when it twice sought and obtained court orders that modified the statutory 60-day time limit on its right to assume or reject the Lease. Conversely, Century asserts that a debtor's scheduling of a certain lease on its statement of executory leases does not determine whether the debtor has an interest in such lease and, further, since ZIC was merely seeking procedural relief in the motion cited by the Partnership (an extension of the time to decide whether to assume or reject its leases), ZIC was not asserting an interest in the Lease on the merits.

In *Chicago Title & Trust Co. v. Baskin Clothing Co.* (1991), 219 Ill. App. 3d 726, 579 N.E.2d 1045, the plaintiff moved for summary judgment based on the terms of the lease. Section 8.2 of the rider to the lease stated in pertinent part:

"Notwithstanding anything to the contrary contained in this Lease, tenant may without Landlord's consent assign this Lease or sublet the demised premises to Tenant's parent or to a subsidiary or affiliate of said parent or to any corporation growing out of a consolidation or merger of any of the aforesaid provided, however, Tenant and its successor or assignee and Guarantor, shall continue and remain fully liable hereunder." (219 Ill. App. 3d at 730.)

The defendant, Baskin, had assigned the lease without the plaintiff's participation or consent to its affiliate, Stevens. Subsequently, the affiliate filed its petition in bankruptcy. The appellate court held, pursuant to section 8.2 of the lease, the assignment did not relieve Baskin of its primary tenant obligations under the lease as there was no ambiguity in the language of section 8.2. The court stated: "We believe that Baskin's liability remained that of the pri-

mary tenant under the terms of the lease even though the lease was assigned to Stevens." (*Chicago Title & Trust Co.*, 219 Ill. App. 3d at 732.) The court explained the effect of the provision on the tenant-assignor:

"When the assignment of the lease occurred in 1985, Stevens [the assignee-affiliate] became the tenant with the first obligation to comply with the lease terms. However, Baskin agreed to be bound on the lease whether an assignment occurred or it did not. The assumption of these obligations by Stevens from the date of the assignment *** until its bankruptcy and release from the tenancy in that proceeding did not alter Baskin's continuing obligation to fulfill the tenant commitments under the lease nor did it affect Baskin's right to resume occupancy of the leased premises until 1996 when the lease term expires." *Chicago Title & Trust Co.*, 219 Ill. App. 3d at 736.

In *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.* (S.D. Ohio 1982), 25 Bankr. 484, the lease at issue stated: "Tenant shall remain liable for all obligations of Tenant hereunder notwithstanding any such assignment or subletting." In ruling on whether a debtor had the right to assume this lease, the court held:

"The initial question before the Court is whether a debtor's right to assume a lease under 11 U.S.C. §365 is applicable to a lease in which the debtor, prior to the Petition filing, had assigned possessory interest in the leasehold.

It is the determination of the Court that a possessory interest (*i.e.* privity of estate with the lessor) is not a requisite to the exercise of a debtor's right to assume the lease under 11 U.S.C. §365.

A lease of real property is a hybrid legal arrangement creating both privity of estate and privity of contract between the lessor and lessee. [Citations.] The 'leasehold' is the interest in real property involved, typically the *res* minus the lessor's reversionary interest. [Citation.] An assignment of the leasehold, without reservation of a right of reentry, may divest the lessee-assignor of the estate. [Citations.] The lessee-assignor, however, remains in privity of contract, and continues to be liable, as a surety, for covenants designed for protection of the lessor's reversion. [Citations.] The lessee-assignor, nevertheless, ceases to have any direct interest in the leasehold and thus has no cause of action against an assignee on the basis of a successful eviction of the assignee. [Cita-

tions.] Significant to the instant matter, the lessee-assignor does, of course, become liable to the assignee for any express covenants within the assignment itself. [Citations.]

In the case at bar, the parties do not dispute that Debtor has validly assigned its interest in the subject lease without reservation of a right of reentry, and consequently has no possessory interest in the leasehold. 11 U.S.C. §365, however, only requires that the lease be 'of the debtor' in order to be assumable. 11 U.S.C. §365(a). It is the opinion of the Court that a 'lease of the debtor,' as that term is used in 11 U.S.C. §365, may be solely contractual in nature, and that there is no direct limitation upon a debtor's rights under 11 U.S.C. §365 by the concept of 'property of the estate' as elaborated in 11 U.S.C. §541." *Allied Technology, Inc.*, 25 Bankr. at 494-95.

We believe that the language in section 17.2 that "Tenant shall remain primarily liable for the performance of all agreements of Tenant hereunder" contemplates a continuing liability for the "Tenant" in the case of an assignment. The question remains, however, whether ZIC is the "Tenant" as contemplated by the Lease. The Lease states that the "Tenant" is ZII. ZII assigned its interest in the Lease to ZC, which assigned its interest to ZIC, which assigned the Lease to Century.

Notwithstanding the parties' arguments, however, we find section 13.1 of the Lease persuasive on the issue of Century's continued occupancy under the Lease.[3] Section 13.1 contemplates the bankruptcy of the tenant or a guarantor of Tenant's obligations and provides in relevant part:

"13.1. *** (3) if Tenant or the guarantor of Tenant's obligations hereunder shall be declared bankrupt or insolvent according to law, or (4) if any bankruptcy or insolvency proceedings shall be commenced by Tenant or the guarantor of Tenant's obligations hereunder and shall not be dismissed within one hundred twenty (120) days thereafter, then without waiving any claim for breach of agreement landlord may send written notice to Tenant of the termination of the term of this lease and on the fifth day next following the date of

---

[3]Neither party directed us to section 13.1 of the Lease. In fact, the relevant page of the Lease was absent from the copy of the Lease contained in the record for appeal No. 1—92—0432. However, as the appeal was consolidated with No. 1—91—1312, we found a complete copy of the Lease in that record.

the sending of the notice, the term of this lease shall terminate, Tenant hereby waiving all rights of redemption. *Notwithstanding the foregoing*, Landlord shall not send any such notice under this Section 13.1, and *this lease shall not be terminated under this Section 13.1 in the case of any so-called reorganization under Chapter 11 of the federal bankruptcy laws involving Tenant or such guarantor so long as rent and other sums of money payable by Tenant to Landlord under this lease shall continue to be paid promptly and fully as herein specified* without adjustment pursuant to any such reorganization and neither debtor's or trustee's certificates or other evidence of indebtedness shall be considered evidence of payment." (Emphasis added.)

■■ Whether or not ZIC is considered the "tenant" or a "guarantor" of Century's obligation under the Lease, it appears that section 13.1 of the Lease is applicable to the question presented for review. In the supplemental complaint the Partnership alleged that ZIC had filed for relief under chapter XI of the Federal bankruptcy laws and that the resulting reorganization proceedings remained pending. However, although there are no allegations of a default or lack of performance of Century's obligations, there is no information in the record concerning Century's payment of rent and whether it has continued "to be paid promptly and fully." Accordingly, we must reverse the decision of the trial court granting summary judgment in favor of Century and remand for further proceedings.

Affirmed in part and reversed and remanded in part.

GORDON, P.J., and McNULTY, J., concur.